The next case on the call is 5-13-5, I'm sorry, 5-14-104 can read the marriage of Ziegler. Counsel has a sore back so she needs to stand for a while. Go ahead and proceed. You don't have to stand the whole time. You can sit. This case involves custody of two young children, Kerrigan who is 6 years old and Sophia who is now 2 years old. At the time of trial they were 5 and 1 but they're both a year older at this point in time. Kerrigan is just starting first grade. Sophia is in preschool. At the time of the hearing before the court, the custody factors were gone through by the judge and I want to address some of those factors. The only one that he found weighed in favor of one way or another was willingness and ability to foster a relationship between the child and the other parent. The rest of the factors though, and this is what we filed our appeal on, were kind of glossed over by the judge at the time of trial. First of all, we presented some evidence that the father had some poor judgment. On one occasion we went into in particular, he actually had the 4 year old child, Kerrigan, she was 4 at the time, this was 2 years ago, had her on the roof helping him with Christmas lights, putting lights, and this is not a flat roof, this is a pitched roof because he had her going back and forth over the middle pitch on the top of the roof. And we put on some evidence with respect to this but the judge didn't cite it or use it as any basis for dealing with the issue of custody. And then there were a number of occasions in which the father was offered additional custody. The parties separated in August of 2012. A temporary order was filed in summer of 2013, I'm sorry, late spring of 2013 and pursuant to that order, afterwards, the mother offered the father some additional visitation time and he turned them down for various reasons. On one occasion he said that he had tickets to a Cardinals game and couldn't go. On another occasion he said that he was going to help a friend chop wood and he couldn't take the children. On yet a third occasion he said he was helping a friend move. On a fourth occasion he was going grocery shopping. On a fifth occasion he said he was helping his mom who was sick. And on a sixth occasion he said he had plans. And then finally, on more than one occasion, he had to work. Now, the last one is very interesting because he had testified that he had flexibility in his job. He worked for the Material Works in Redbud which is a metal recycling place and he claimed that he had the flexibility and ability to be able to take the children whenever he needed to. But yet he said on a number of occasions that he couldn't get off because he had to work. And then the other half of it is the excuses that he used, which is everything besides the dogs in my eyes, the sons in my eyes and the dog in my homework. But the excuses that he used shows that he has no flexibility in his personal life or at least as a minimum that the children are not a priority. So I submit that this issue should have been addressed by the court as part of the reason for deciding who should have primary custody. On another – dealing with another factor, there's two factors actually in the statute that address the issue of stability. And the judge found both of those to be neutral, but I submit that they are not necessarily neutral. One of them has to do with community and location and school, and the other has to do with friends, relatives and other significance who have a relationship with a minor child. Now, during the course of the testimony, the mother testified that she had been primarily responsible. Although both of them were involved in caring for the children, she had been the one who had been primarily responsible for their care, making sure they were dressed, cooking for them, feeding them, changing their diapers, et cetera. And although the father had been somewhat involved, he had not been as involved as the mother. And part of the stability that we presented to the court was these are mom's rules, it's mom's house. It's not just a physical location because at the time they physically separated. When she moved out, she moved – in August of 2013, she had moved out. Initially, she moved to Ruma, and then later in August of 2013, she moved to Smithton, Illinois. She was in the Freeburg School District at that point in time. And part of our argument to the court was that the stability that mom had created wasn't just the physical location, but also the fact that she had to set a routine, rules, do your homework, et cetera, et cetera, eat your peas, go to bed. She had developed that during the time she had been the children's primary caretaker. Now, I thought there was some indication that there was more than two moves, like five. Well, there was five over the course of the entire children's lives. I was just talking about since they separated. And you're talking the six years, five years, within five years, five times? Roughly, yeah, about six years. Actually, the five moves that she had were actually geared towards the child I'm about to get to, which is not a child of this marriage. It's a child she had separately. And, yes, there were moves that she had had with that 13-year-old that she had had over the course of that. Before this happened here? Before. How many moves has she had since those two that you mentioned up until the end of the court? Just dealing with these two children, two moves. But going all the way back for her 13-year-old, she had a total of five. Yes, that's true. But with respect to what she had set up in the way of a relationship and rules and a routine for the children, that is something that she had developed throughout the marriage prior to the time of separation. As far as one of the other factors that is involved, and I think this is the most significant factor, and that is she has a stepchild. There's not a half-child. A half-sister to these two children is a child she has from another relationship, and her name is Samantha. Samantha is 13. Well, she's now 14, a year-old sister to Kerrigan, who's six, and Sophia, who's now two. And initially, a temporary order was entered in August of 2013, and at that point in time, Judge Gross ordered that Kerrigan could be enrolled in kindergarten at the Freeburg Kindergarten Public School, which was the same public school system that Samantha was attending. And that replaced Samantha along with Kerrigan and Sophia, who they had lived with throughout the marriage. They had all three lived together. They all three lived together under the temporary order, but then at the time of final hearing in fall of 2013, he awards the father primary custody and awards a 54-46 split in custodial period of time between the two parents. So, with respect not to the primary custody issue, but with respect to the physical custody, he actually had less time with his children. Correct. And you're suggesting because of the fact that the mother had this child from a prior relationship, that that kind of trumps his period that he would be entitled to spend with his children? Not so much trumps, but for the first time, the three sisters were not living most of the time together. This is the most custodial period he had ever had. Under the first two temporary orders, he had 30% and then 34%. Now, he's bumped up to 46%. And you'd like to see what, or she would like to see what? She would like to see something closer to the 30 or 36 that was entered in the temporary orders. And the reason being that she wants her family more intact with the other stepchild. To help maintain that relationship with Samantha. The children have a very close relationship with Samantha, and that testimony is part of that. Assuming that is true, does that not impact his relationship with his two girls? Well, the relationship he had with his two girls was 30 to 34% of the time up until that time. I'm aware of that. Yeah, to continue that would have kept him in that type of relationship. He would have been able to maintain the same type of relationship that he had with the girls prior to the time of the judgment. Well, what would be wrong with giving him more? His hesitation. Well, there's nothing wrong with giving him more, but at some point in time, and I think the case law speaks to this, when you approach a 50-50 type relationship, the children feel like nomads when they're moving from house to house. And to keep it the way it would have been would have not only maintained their close relationship with their sister, but also given them a home, a place of civility. Whereas at this point in time, with the schedule the way it is, they don't really feel like they have a home. But the standard parenting orders that we see where every other weekend, holidays, that kind of thing, what's the percentage on those? Those are roughly about 20 to 25%. We were offering more than that, about a third, roughly, 30 to 34%. But also in this case, didn't the court try to coincide the visitation or the time period with the mom at the same time that she then would have custody of her, of the step-sibling, because I think that there was a visitation schedule with respect to her as well with her father. Yeah, the father in that case only has weekends for the most part. Well, that's what I'm saying, but not every weekend. I thought it was every other weekend as well. It's every other weekend, so he lined up those weekends with these weekends. So he did try to accommodate, apparently, that sibling relationship that she wants to foster as well as apparently feeling that the father was entitled to some greater visitation with his own children. Yes, he did line up Samantha's weekend visitation with children's weekends in this case, yes. So what really happened here? I don't understand what really happened. Okay, we have three girls living together by agreement, right? Yes. This was an agreed-to order, the little one's in Freeburg with her half-sister, and then all of a sudden the court yanks the child out of Freeburg. What happened? He wanted the child returned to Redwood. That's the short and the long one. But why? What's the evidence of returning the child? Because he felt like, and you won't see this anywhere in the record, this was actually evinced back in Chambers, but he was, he believed that the children had enough ties to Redwood to make, and mom wasn't, the mother had no intention of moving back to Redwood. She now lives in Smithton, and so. Who's where? Smithton. Okay, I can hear you. So he was more interested in, he gave the dad primary so that he could make the school decision, and the school decision is to keep them in Redwood. So that's really what. But I thought that also the looming factor was that he thought that the father would facilitate the relationship between the parents better than the mom would. Well, that's, and that's the one factor that he focused on with respect to. And is that wrong to focus on that factor? Absolutely not. I think it's a very important factor. Although there are some facts that address that issue. For example, the allegation was that she would, the judge specifically stated neither one of them is a model of flexibility in facilitating a relationship with children and the other parent. So, and that's probably true. But I think, and then there were some allegations about some of the things the mother had said, but her actions were, she offered the father additional periods of visitation, custodial periods during the temporary orders, despite the fact that he kept turning her down. Well, I, just to argue the other side, just because I saw that in there as well, it was last minute to her convenience type of offering, and it made, and if he had plans that were not that flexible at the time, then he did turn it down. And there were conditions attached to his offering the kids. They couldn't be around such and such a person or go to such and such a place. Well, the only real condition that he had was that she wanted to see the children on one occasion during the course of the additional time she was offering. She wanted to stop by and say hi to the kids for a short period of time during one of those periods. And he wasn't sure that they would even be there, and she said, no, then you can't have them. Correct. As far as his allegations about, she only told me at the last minute. Well, he did say he added a copy of it. That was sometimes the case. He didn't say that was all the time. And there were occasions when he was given a couple of days notice and he still turned her down for the reasons that I've mentioned about grocery shopping or helping a friend move or chopping wood. I mean, these are the reasons why he gave as some of the reasons for turning down the visitation. And he testified, or at least it's stated in his brief. He testified, well, this only happened four or five times or maybe three times. But there's at least six excuses that he gave. So we know it happened at least six times. But wasn't there also he had never not utilized his visitation? He had used it, yes. He had always taken his custodial care. That was correct. He had never not used those. And we are talking about additional time she's offering him during the period between when they separated in August of 2012 and when the time of the order in fall of 2013. So we're talking about during that particular period. As far as as far as one of the other issues that was raised in his brief in the father's brief, he made an issue about the fact that he hadn't been told about the tumbling in cheer. But the problem with that is he could have asked Kerrigan about the tumbling in cheer, and she would have told him. There was no testimony that the mother was interfering with by telling Kerrigan, hey, don't tell your dad that you want to be in tumbling in cheer. In fact, the mother invited the father to the very first tumbling in cheer session to determine her eligibility and physical age and acumen to be able to continue in tumbling in cheer. So he was present for that. He knew about it. He made a big deal at trial about not. Please report, Mr. Gregor. I'd first like to touch on. Well, first of all, my name is Natalie stepping. I represent the appellate Kevin Zeiger. I'd first like to touch on the standard of review. The reviewing court shall not overturn the trial court's decision in cases such as these, unless the decision on the trial court was against the manifest weight of the evidence, manifestly unjust or an abuse of discretion. And all evidence should be viewed in light of the prevailing party, which here is is my client. Appellate court is not to reweigh any evidence. And I'd like to point out that Judge Groves, the trial court judge, had the opportunity on two occasions, two full trials to observe the personality and the temperament. And I'd first like to address what your honor spoke of. What was the difference between the August 8th hearing and the December 4th hearing? And what I saw the view in the change of there was a lot more evidence introduced at the December 4th hearing. There were text messages to cooperate. Mr. Zeiger's testimony, all of the incidents, basically in the first temporary order or the second temporary order, they were supposed to agree upon a babysitter. And there were a lot of text messages back and forth. And we come to find out that all this time, Ms. Zeiger had not been abided by that. She was leaving the children with her boyfriend, and this was not agreed to by Kevin. This was not something that he knew. And when he found out, it was basically, this is too bad. This is the way it's going to be. And with regard to the tumbling and the cheer practice, Kevin Zeiger, he testified to the fact that it was not the tumbling and cheer that he had a problem with. It was basically the way that it was approached, that he was not advised of it beforehand. And we look at the fact that he took it upon himself to enroll the oldest daughter, the now 6-year-old Kerrigan, in swim lessons. And Kelly Zeiger testified on the stand that, yes, she was approached beforehand. She did comply with that. So there was a lot of evidence at the second hearing that was not brought to light at the first hearing because we were so limited in our scope and what we could present, because the issue was mainly where the child, Kerrigan, the oldest one, was going to attend school in the fall. And there were several other incidents where Mr. Zeiger did step up and watch the children. In May of 2013, he watched the children while Kelly went to an eye doctor appointment while she went to Walmart. He switched time with her so she could take the children to go to the Redbud Parade. It was his scheduled time. He also agreed to let her take the children on a summer vacation, which predated both hearings, the August and the December. And he missed out on an entire week's worth of visitation. He was not compensated for that time, but he allowed the children to go because it was in their best interest to go on a trip with their mother, a vacation with their mother. And when we're speaking to the conditions and the demands that were placed upon Kevin, there was the Saturday incident where he could have an additional Friday overnight if he made sure that he was at his house with the children Saturday afternoon, which, from my client's perspective, ruined their whole Saturday. They couldn't go to the zoo. They couldn't go anywhere because Redbud is a great deal away from St. Louis. There was also another incident where Kelly Zeiger approached Kevin about visiting her sister in Nebraska. She was going to be gone an entire week, and she was going to offer that additional time to Kevin. He jumped at the chance to get that time with his girls, but she opted not to give him that time, and she did not go to Nebraska, so it ended up being a moot issue. However, she wasn't going to allow him to have that time unless he took off work the entire week, basically corroborating the text messages that we have between the parties where she refers to him as nothing but a babysitter. When I asked Kelly Zeiger on the stand whether or not she takes off work on her time, she said no. She is a babysitter, so there's a double standard here. What about the school issue? How did this young girl do in Freeburg? I believe that she did well. However, she had four years at St. John's and Redbud prior to going to Freeburg, and I believe appellant's brief doesn't really hit on that issue that we're talking about one year and the stability and taking her away from that. Well, there was also a lot of stability in her attending Redbud and being in the St. John Lutheran school system, and the trial court did not intend for Kerrigan Zeiger to spend an entire year in Freeburg because our hearing was actually on December 4th, and we were to get the proposed judgment between both attorneys and get it to Judge Gross in time for her to actually begin the January back at St. John's. That didn't happen. That did not happen. The proposed judgment was exchanged between the parties around December 12th, and then we had to file a motion for entry of the judgment in late January. And it got entered February 24th. Yes. Yes, Your Honor. So the child went back to Freeburg. Yes. They had to continue under the temporary order, and then she was able to obviously begin St. John's. Is she tumbling and cheerleading? She is still, but what the record doesn't reflect is that the parties have varied from where she was attending before and actually come up with an agreement for her to attend someplace else that's more convenient for both of them. But yes, she is still in tumbling and cheer, and with regard to the mother's rules and hitting on the stability, Kevin Zeiger, he testified to the fact that both he and Kelly were very actively involved in all of the girls' activities, putting them to bed, feeding them. And it's hard to argue against that when you consider the fact that the mother worked a lot of night shifts. She worked 12-hour shifts, didn't she, as a nurse? She did, Your Honor. So it's easy to—you can't really argue against the fact that he did put the girls to bed on a regular basis, make sure that they were bathed. I would argue against that the willingness to collaborate in a relationship was the only factor that the judge really hit on. I know that he actually went down every factor in 602. He read it aloud in court when he gave his ruling. Well, how did he deal with the alcoholism and putting a child on a pitched roof? Well, with the alcohol, there was the incident before Father's Day where Kelly Zeiger actually had her sister come over in the middle of the night, left the house, and went out looking for Kevin's vehicle. She had seen his vehicle out earlier that night, and she, I believe, wanted to see if he was still out so she could not give him the visitation on Father's Day or look out for the kids' interests. His vehicle was still out. He testified to the fact that he was drinking water at that point of the night. He also testified to the fact that he's never been intoxicated in the girls' presence, that both he and Kelly would drink at family functions, that it was not just him. And Kelly Zeiger did not go into the bar the night before Father's Day. She did not look in the window. There is no evidence to corroborate her story that night that he was intoxicated and not able to care for his children. Only when he was out. Yes, Sunday. What about the roof? Did he have the child on a pitched roof? He did, Your Honor. He had the child up on the pitched roof. Kelly Zeiger was in the house, and in speaking to my client about that incident, he did not believe that he was putting her in any danger. It was an activity that he was doing with his daughter, and they were helping each other put up the Christmas lights, and he did not believe that he was putting her in danger. How old was she? She would have been four at the time. Four. So when Ms. Zeiger came out and got upset, then she got down off the roof. And I'm not sure if the record accurately reflects how long she was up on the roof prior to Kelly Zeiger coming out. Do you know what the weather was that day, or does the record reflect it? I don't think that the record reflects it. But the judge didn't deal with that. He did not. He didn't deal with putting a child in danger, did he? He did not address that issue. But in the agreed order, they had a provision that the parties wouldn't drink for, I think, at least 12 hours before they would see the child. So there must have been some concern there. Well, we reached the agreement, and it was we were basically that day, there were hearings ahead of us, and we were negotiating a deal in the hall, Mr. Grinegar, myself, and the clients, and that was something that his client felt that she wanted in the agreed order, and my client said his position was I have nothing to hide, I have no problem with having that in the order. Did the judge ever talk to the girls? He did not talk to the girls, no. In looking at the time, the division of time between the parents here, the judge actually asked both parents whether or not they wanted joint or sole custody and how they would base their decision. In asking that question, Kevin Zeiger's response was that he wanted joint custody because he believed that both parties should be equally involved in the decision-making, and when the judge asked about the division of time, he said that he wanted it as close to equally divided as possible because he thought that the girls were young and that there was a grave importance in both parents being involved and that he wouldn't want to take that away from Kelly. When Kelly was asked the same question, her response was that she did not think joint custody could work and that she wanted the girls for the majority of the time and Kevin to only get every other weekend and one night a week, which just did not work with her schedule, and Judge Gross was very clear both in chambers and on the record on several occasions that he was a proponent of both parents being involved and that this was not going to be a weekend parenting situation. He did not want to take it away from either parent if they wanted to be involved in after-school extracurricular activities, parent-teacher conferences, and picking the children up from school. He said there's a lot that can be missed if you're just a dad on the weekends and you don't see all of the things that go on. In addressing the moves that you discussed, Your Honor, when the petitions were filed prior to the August 8th hearing, Kevin Zeiger actually filed the initial petition, and when he filed his petition, Kelly Zeiger was still living in Ruma, Illinois, which is in the Redwood School District, and she had taken it upon herself, even though the first temporary order had joint custody, to enroll the eldest daughter in kindergarten at Redbud Public School. And so that was what sparked him to file the original petition. What sparked him? I'm sorry. That she was enrolled at Redbud Public because... Instead of parochial? St. John's Luther. He wanted her in a parochial school. Yes. And in the time before that was heard, Kelly Zeiger had then switched gears and was moving to Smithton, which is in the Freeburg School District. So there were a lot of moves and jumps, and she actually moved one other time when Kerrigan was little to Summerfield, which is near Lebanon, Illinois. So there were several moves. The eldest daughter, which is not a daughter of the marriage, she has been in five schools, as you discussed. And if we're talking about my client's character, it's very accurate in the record that he cared for all three children, and he was involved in all three children, and even when the parties were separated, he would continue to keep the daughter that was not his and pick her up from school. So we have a person that wants to be involved, not only with his children, but with someone that he helped raise for several years during a marriage, and he just doesn't want to have time with his kids limited to a weekend parenting situation. How do you think her moves have impacted the children? Everybody's talking about these moves. Well, my client testified, and it was all opinion testimony, however, that he believed that the eldest daughter, Samantha, really never had the opportunity to get involved in extracurricular activities or form a firm base of friends because of these moves. And Kelly Zagar's response was that, you know, Samantha was doing well, and that was just her personality. But Kevin was intending to live in a home. Go ahead. He was intending to live in that home that was the marital residence and continue to live there, and he didn't want to see the same instability for his two girls as he had watched with Samantha. Okay, thank you. Thank you, judges. Thank you. With regard to the moves, Kelly moved because she moved initially out of the marital home and ultimately to Smithton because she wasn't getting any child support. At that point in time, he was only having children about 30 percent of the time, and she was paying for all of their expenses. Samantha was doing very well at school and still is, and that was part of the testimony, too. It's not had any negative impact on her having moved the numbers of times that she has. And they've all been local moves. She hasn't moved to Texas or Florida or Virginia or anything like that. It's been in the Smithton-Redbud area, and now her child is attending school in Freeburg because Smithton falls part of it into the Freeburg school district. And on the issue of child support, one of the remedies that we're asking for that I want to speak about for just briefly is child support at the statutory amount would have been $1,175 a month roughly, and none was ordered in this particular case despite the fact that during a significant period of the separation between the time of the filing of the petition in March of 2013 and the time of the final order in December of 2013, that the father only had the children 30 percent of the time. Despite that fact, the judge didn't order any child support to be paid. He went into detail about he had a very detailed list of all of the expenses he had paid for the children, which didn't even come close to that $1,175 mark. So that's part of what we're asking for in the way of relief. Mention was made about St. John's as a school. I wanted to be perfectly clear that St. John's was preschool only up until the time Kerrigan started kindergarten in Freeburg in the 2013-2014 school year. She had gone to St. John's, but like I said, that was strictly preschool, and as this court well knows, preschool is not the same as school in any sense of the word. As far as the alcoholism, or alcohol of drinking, the mother had testified in detail about all the social events that they went to prior to the separation in which she would be taking care of the kids while dad would be drinking so that she could drive home, and they did that on a number of occasions prior to the time that the parties separated. When the father's working, he works Monday through Friday? Yes. Who takes care of the kids? She takes care of them because she works night shift, so she'll be taking care of them during the day. And does he ever leave them with his mother, grandma? In fact, one of the concerns we had was him not to leave them with his grandmother alone. He was supposed to leave them with both of them. Apparently, he only did that on one or two occasions. Is that in the order anymore? That was in the initial temporary order, but it wasn't incorporated into the permanent order because he made it clear to the judge that he had no intention of leaving the children with her alone again. And that's why the language was put in, getting back to the alcohol of drinking for just a moment, that's why that language was put into the temporary order. She had some very legitimate concerns about his drinking. As far as the roof incident that was mentioned, it was interesting that whenever the mother went to the father and said, why do you have our 4-year-old on the roof? Get her down. His response was, shut up. And then finally he did ultimately take the child off the roof. But I think it was a very legitimate concern having a 4-year-old on a pitched roof going back and forth. And then the father's response whenever the mother brings that to his attention. And I think that's part of the reason why the mother was concerned about joint custody here. They're not on the same page with respect to what even is a legitimate concern about endangering the child. I mean, it's hard to have joint custody if you can't even discuss those things. And the other half of it was, and this goes back to what I made mention of a moment ago, if the father wanted to know about Kerrigan being and tumbling and cheering, he could have asked Kerrigan. But quite frankly, he didn't ask Kerrigan. He could have asked her. He could have found out. He could have signed her up. He could have made sure she started tumbling and cheer. And obviously he did know about it and she did tell him ahead of time because he attended the very first session. And she had told him about the very first session as a prelude to that. So the argument that he didn't know anything about the tumbling and cheer, it doesn't fly because he was actually at the first session. Why did she choose Midwest Twisters? And that's in the testimony because Kerrigan's little friend also attended Midwest Twisters. And she wanted to go with her friend and participate in tumbling and cheer with her friend, et cetera, et cetera. So that was the reason why it was chosen Midwest Twisters. And it found just a little bit of a hype as opposed to here. Thank you, counsel. In case you'll be taking another advisement, you'll be notified in due course. And we'll be in recess until 1.30. All rise.